United States District Court
Southern District of Texas
**ENTERED**
March 08, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| SAMIR IQBAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:21-cv-00081 |
| | § | |
| UNIVERSITY OF TEXAS RIO GRANDE | § | |
| VALLEY, | § | |
| | § | |
| Defendant. | § | |

## ORDER AND OPINION

The Court now considers Defendant's motion for summary judgment,[1] Plaintiff's response and evidentiary objections,[2] Defendant's reply and response to evidentiary objections,[3] and Plaintiff's reply to evidentiary objections.[4] After considering the record and relevant authorities, the Court **GRANTS** the motion for summary judgment.

### I.    FACTUAL AND PROCEDURAL HISTORY

This is an employment discrimination case arising out of several actions taken by Defendant, the University of Texas, Rio Grande Valley ("Defendant" or "UTRGV"), against Plaintiff faculty member, Dr. Samir Iqbal ("Plaintiff"), ultimately leading to his semester-long suspension Fall 2019.

---

[1] Dkt. No. 22.
[2] Dkt. No. 25.
[3] Dkt. No. 33.
[4] Dkt. No. 34.

The following facts are either undisputed or viewed in favor of Plaintiff. Plaintiff was hired in September 2017 as a faculty member and Chair of the Department of Electrical Engineering.[5] That Department is within the College of Engineering and Computer Science,[6] and Alexander Domijan served as Dean of the College (i.e., Plaintiff's superior) at the time of Plaintiff's hire.[7] Plaintiff's position as Chair of the Department included a stipend to the regular salary of a tenured professor.[8] His employment agreement also included several peripheral benefits, including a startup package of $271,000 for the first two years[9] that he negotiated with Dr. Domijan.[10] Those funds were allocated to certain categories such as equipment purchases and student assistantships for his research,[11] though Dr. Domijan also approved some equipment funds to be moved into "operations" to cover journal publication and scientific memberships.[12] Additionally, Plaintiff's wife applied for the Graduate Program in Psychology, and Plaintiff was told by the Engineering College's Assistant Dean for Administration that he could use his startup funds to provide his wife an assistantship in that degree program.[13]

Almost immediately upon beginning as Chair, Plaintiff found himself in conflict with others in the Department, especially Dr. Sanjeev Kumar.[14] This conflict is well documented in Administrative Reports by internal investigator Becky Espinosa of Defendant's Office of Institutional Equity ("OIE") into Dr. Kumar's complaint of national origin discrimination and retaliation by Plaintiff against him.

---

[5] Dkt. No. 1 at 2, ¶¶ 5-6.
[6] *Id.*
[7] Dkt. No. 25-4 at 2.
[8] *Id.* at 6.
[9] Dkt. No. 22-2 at 65-66.
[10] *Id.* at 68.
[11] *Id.* at 66.
[12] *Id.*
[13] *Id.* at 76.
[14] *Id.* at 95, *et seq.*

In September 2017, Plaintiff asked Dr. Kumar to submit his faculty performance review via Microsoft Word instead of Adobe PDF.[15] Dr. Kumar felt uncomfortable with this file type since it is easy to alter Word files, and he submitted a PDF.[16] Plaintiff insisted that Dr. Kumar resubmit the evaluation as a Word document, and Dr. Kumar contacted the Provost's office, which told him that PDF was an acceptable format.[17] Despite this exchange, on November 12, 2017, Plaintiff emailed Dr. Kumar to discuss the performance review and said, "I took the liberty to create a word file so I could copy paste this information for your perusal."[18] Dr. Kumar felt that this direct contravention of his request on a topic they discussed was aggressive and unprofessional.[19]

On or about the same time, Plaintiff removed Dr. Kumar from faculty committees.[20] When Dr. Kumar was unable to answer a question Plaintiff had based on data from an industry database, Plaintiff said "If such an accomplished professor of computer engineering like yourself can not access information from network, we should find replacements. I can ask IT folks to check the logs of file as to who accessed which files at what time. What do you think? and [sic] stop telling me when which file has to go to whom and when. that [sic] is probably beyond your job purview."[21] In an email chain with several other faculty members, he mocked Dr. Kumar, saying the department could set up a committee to help him sift through his emails.[22]

Plaintiff's relationship with Dr. Kumar continued to spiral until, on February 18, 2018, there was a "tense conversation" in Dr. Kumar's office in which Plaintiff told Dr. Kumar that he

---

[15] Dkt. No. 22-2 at 101.
[16] *Id.* at 102.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at 103.
[21] Dkt. No. 22-2 at 103-104.
[22] *Id.* at 104.

would "screw" and "destroy" him, and after which Dr. Kumar called campus police.[23] On February 22, 2018, Plaintiff held a faculty meeting in which he publicly accused Dr. Kumar of writing a poor performance evaluation of him as Chair, shouted in the meeting, tore up papers, and threw them (possibly at Dr. Kumar).[24] These facts were substantiated by eyewitnesses.[25]

On February 23, 2018, Plaintiff sent Dr. Kumar an email modifying his teaching schedule to increase his number of courses and changing his teaching location from Edinburg to Brownsville.[26] The OIE investigation into Dr. Kumar's complaint found that this unilateral modification was not common practice, was illegitimate, and was in retaliation for Dr. Kumar's poor evaluation of Plaintiff.[27] While Ms. Espinosa did not substantiate Dr. Kumar's claim that Plaintiff discriminated against him on the basis of his Indian national origin, her investigation did substantiate Dr. Kumar's retaliation claim against Plaintiff.[28] So Plaintiff received a written warning before he hit his 6-month employment milestone.

That same month (February 2018) Defendant UTRGV underwent a shake-up in leadership. Dr. Patricia Alvarez McHatton became Executive Vice President of Academic Affairs.[29] In that role, Dr. McHatton replaced Dr. Domijian (Dean of the College of Engineering and Computer Science) with Dr. Ala Qubbaj as Interim Dean.[30] Two months into his role as Interim Dean, in April 2018, Dr. Qubbaj decided to replace several department chairs, including Plaintiff.[31] After

---

[23] *Id.* at 98.
[24] *Id.* at 99.
[25] *Id.*
[26] *Id.* at 100.
[27] Dkt. No. 22-2 at 101, 107.
[28] *Id.* at 107.
[29] Dkt. No. 25-5 at 3.
[30] Dkt. No. 25-6 at 4.
[31] *Id.* at 6.

discussing his decision with Dr. McHatton,[32] Dr. Qubbaj appointed Dr. John Abraham as Interim Chair[33] of the Electrical Engineering Department.[34]

Without his role as Chair, Plaintiff was required by university policy to seek approval from the Chair for travel and reimbursements. Plaintiff was quite the conference jetsetter, and in the first and second quarters of his employment, Plaintiff was on approved travel status 40 days and 34 days respectively, far more than his colleagues.[35] This included academic trips to Turkey, Malaysia, Ecuador, and the United Kingdom.[36] In the summer of 2018, Plaintiff also requested travel to attend conferences in Portugal and Jordan, but they were not approved because Plaintiff had in-person teaching commitments.[37] He sought to teach online or have a guest lecturer fill in, but Dr. Abraham felt that Plaintiff should either be available for students, or not teach summer classes at all.[38]

Plaintiff did not take kindly to this new oversight. In response to Dr. Abraham's decision not to allow him to teach online, Plaintiff said "I have strong belief that the Creator will still feed me even if you play God, try to sabotage my efforts, and use your control to manage me and how I teach my classes."[39] But after deifying Dr. Abraham's managerial accountability, he also tried to bump him down a few notches by making fun of his inexperience in the lab. He sent an email to another faculty member and Dr. Abraham saying "Dear Richard, Can you please brief Dr. Abraham on the established policies regarding his concerns on 'hazardous material'? He has

---

[32] *Id.* at 7.
[33] Dkt. No. 25-4 at 4.
[34] Dkt. No. 25-6 at 5.
[35] Dkt. No. 22-2 at 71.
[36] *Id.* at 76-77.
[37] *Id.* at 70.
[38] *Id.* at 71.
[39] *Id.* at 15.

background in programming."[40] Those remarks about his own superior led to Plaintiff's second formal reprimand on July 17, 2018.[41]

Dr. Abraham and Dr. Qubbaj also disagreed with several decisions that the previous administration had made regarding Plaintiff's peripheral compensation, and they sought to make some changes. Plaintiff believed that under his agreement with the former Dean, Dr. Domijan, his startup funds had "no strings attached"[42] and did not need to be used in specific categories. In May and June of 2018, Dr. Abraham denied several of Plaintiff's category change requests, including moving money from equipment to travel and assistantships.[43] Plaintiff also sought to roll unused Year I funds into Year II,[44] and that request was initially denied.[45] Rollovers were uncommon since many of the university's funding sources expired if they were not used.[46] However, on Dr. McHatton's instruction, Dr. Qubbaj ultimately allowed the rollover but informed Plaintiff that the funds were not "unrestricted."[47] Plaintiff alleges that Dr. Abraham threatened to totally remove Plaintiff's startup funds, but an OIE investigation did not find this credible based on testimony and since the funds were not within Dr. Abraham's control.[48] Furthermore, Dr. Qubbaj cancelled Plaintiff's wife's assistantship after her Spring 2018 semester because he did not believe it was appropriate for Plaintiff to use College of Engineering and Computer Science funds to pay for his wife's work for a different college.[49]

---

[40] *Id.*
[41] Dkt. No. 22-2 at 14.
[42] *Id.* at 15.
[43] *Id.* at 66.
[44] *Id.*
[45] *Id.* at 67.
[46] *Id.* at 68.
[47] Dkt. No. 22-2 at 67.
[48] *Id.* at 68-69.
[49] *Id.* at 77-78.

Tensions between Plaintiff, Dr. Abraham, and Dr. Qubbaj continued to boil over. On September 14, 2018, the summary judgment evidence indicates that Plaintiff raised his voice at Dr. Abraham in the hallway of the faculty offices to the point that a staff member called the Associate Vice President of Faculty Affairs to ensure that there was no danger to anyone.[50] Dr. Qubbaj had to ask them to step into his office so as not to disturb others.[51] On February 28, 2019, there was yet another incident in which Plaintiff raised his voice to another faculty member at a departmental committee meeting led by Dr. Hasina Huq.[52]

Plaintiff's absence from the university campus was also a problem for his superiors throughout his employment. As has already been recounted, Dr. Abraham denied some of Plaintiff's travel requests in the summer of 2018 because it would preclude Plaintiff from being available to students for classes he planned to teach. In September 2018, Plaintiff asked Dr. Abraham if he could be excused from any faculty meetings on Fridays between 1:00 p.m. and 3:00 p.m. in order to attend Friday prayer at a mosque.[53] Dr. Abraham approved that request and asked Plaintiff to provide a list of religious holidays he would be observing to help with scheduling future faculty meeting, but Plaintiff did not follow up.[54] In deposition testimony, Dr. Abraham insisted that "no one complained . . . about him not being there in Friday faculty meetings."[55] and that the real issue surrounding Plaintiff's absence related more to his general aloofness, especially in early 2018. Dr. Abraham stated "He had not been coming to his office, meeting with the students. We

---

[50] *Id.* at 17, 28-29, 31.
[51] *Id.*
[52] *Id.* at 31, 35.
[53] Dkt.. No. 22-2 at 84.
[54] *Id.*
[55] Dkt. No. 25-3 at 9.

could not find him. When there's equipment come in for him to pick up, he wouldn't pick it up. So we had not seen him."[56]

As the faculty geared up for the Fall 2019 semester, Dr. Yong Zhou, Plaintiff's fellow faculty member, sent out faculty course lists.[57] Dr. Zhou forwarded Plaintiff's response, "I will teach all courses online.", to Dr. Abraham.[58] Dr. Abraham explained that because of the college's accreditation status, he would not be able to teach those courses online.[59] Plaintiff insisted: "Please list it as online. I will teach my courses online."[60] Dr. Abraham's patience worn thin, he replied, "It will NOT be listed online." to which Plaintiff ominously retorted, "Oh no. It will be. Trust me on this."[61]

Obtaining Plaintiff's undergraduate transcripts proved to be yet another recurring issue. Before he was officially hired, Defendant asked him for official copies of his undergraduate transcript.[62] Despite numerous reminders, he did not communicate on the issue until one year later (July 2018) in order to say, "[t]he fundamental question is who will pay for the fees and the associated shipping and miscellaneous costs?"[63] After numerous reminders and explanations that it is the faculty member's responsibility to provide official transcripts, Plaintiff had still not provided the required documentation on May 6, 2019.[64]

---

[56] *Id.*; *accord* Dkt. No. 22-2 at 77 (absenteeism as the rationale for denying an Outside Activity request by Plaintiff).
[57] Dkt. No. 22-2 at 21.
[58] *Id.* at 19.
[59] *Id.*
[60] *Id.* at 18.
[61] *Id.*
[62] *Id.* at 26-27 (July 3, 2017).
[63] Dkt. No. 22-2 at 24.
[64] *Id.* at 22.

Two months prior, on March 4, 2019, Plaintiff filed a formal complaint of national origin and religious-based discrimination with OIE against Dr. Abraham.[65] The complaint alleged several incidents of mismanagement that were not addressed by OIE's report since they were about others, not Plaintiff.[66] The complaint alleged that Dr. Abraham's decisions with respect to Plaintiff's funds allocation, travel, committee membership, lab use, equipment purchases, course selection, office allocation, Plaintiff's wife's assistantship, Outside Activity requests,[67] reimbursements, and hiring were all influenced by discrimination against Muslims and Pakistanis.[68] Ms. Espinosa conducted an investigation into Plaintiff's allegations like she did for the 2018 complaint against him by Dr. Kumar. But the report did not come out until May 2021.[69]

On May 14, 2019, Dr. Qubbaj issued Plaintiff a notice titled, "Intent to Suspend Without Pay for Unprofessional and Uncollegial Conduct."[70] It listed four reasons for the disciplinary action: Plaintiff raising his voice in the hallway on September 14, 2018; Plaintiff raising his voice in the faculty meeting on February 28, 2019; Plaintiff's email response to Dr. Abraham regarding online teaching; and Plaintiff's failure to submit his official undergraduate transcript.[71] Plaintiff was given an opportunity to respond, which was considered, and a final decision to suspend was issued May 21, 2019.[72] The suspension would be effective June 1, 2019, to December 31, 2019, during which time Plaintiff would not be allowed on campus.[73]

---

[65] *Id.* at 64.
[66] *Id.*, note 1.
[67] I.e., allowing Plaintiff to commit a certain number of hours per week to outside consulting.
[68] *See* Dkt. No. 22-2 at 64-84.
[69] *Id.* at 64.
[70] *Id.* at 10.
[71] *Id.* at 11.
[72] *Id.* at 28.
[73] *Id.* at 29.

Plaintiff filed a grievance with Defendant on June 25, 2019, alleging that his removal as Chair of the department and his 2019 suspension were made in retaliation for his OIE complaint and/or on the basis of discrimination.[74] Dr. Qubbaj denied the relief requested in the grievance on July 10, 2019, reiterating the fourfold basis of his suspension.[75] A hearing was held on September 9, 2019, before Dr. McHatton (Executive Vice President for Academic Affairs) in which Plaintiff was represented by counsel.[76] Reviewing the evidence of Plaintiff's "unprofessional, uncollegial, and insubordinate conduct," Dr. McHatton denied the relief requested in the grievance.[77]

Plaintiff filed a charge of discrimination on December 16, 2019, with the Equal Employment Opportunity Commission and received a notice of right to sue.[78] Plaintiff filed his Original Complaint in this Court on March 4, 2021.[79] The Complaint alleges several adverse actions by Dr. Abraham, Dr. Qubbaj, and Dr. McHatton were made on the basis of racial, religious, and national origin discrimination, and/or were made in retaliation for his March 4, 2019, complaint against Dr. Abraham.[80] Plaintiff alleges discrimination and retaliation in the following actions:

- Being removed as Chair of the Department of Electrical Engineering;
- Denial of rollover on startup funds;
- Threat of removal of startup funds;
- Denial of opportunities to travel to attend conferences;
- Exclusion from committee memberships;
- Attempt to block use of lab and equipment by Plaintiff's students;
- Unnecessary computer purchases;
- Direction to teach courses outside Plaintiff's area of expertise;

---

[74] *See* Dkt. No. 22-2 at 31.
[75] *Id.*
[76] *Id.* at 34.
[77] *Id.* at 35-36.
[78] Dkt. No. 1 at 5, ¶ 11.
[79] Dkt. No. 1.
[80] *Id.*

- Being prevented from accessing an office space and another faculty member being authorized to use the same office;
- Dr. Abraham's use of a master key to gain access to Plaintiff's office;
- Cancellation of Plaintiff's wife's graduate assistantship;
- Denial of Plaintiff's Outside Activity request;
- Delay in travel reimbursements;
- Delay in reimbursement for publication charges;
- Being threatened by Dr. Abraham that his tenure would be revoked;
- Being suspended by Dr. Qubbaj; and
- Improper handling of his OIE complaint.

## II.  SUMMARY JUDGMENT LEGAL STANDARD

Under Rule 56, summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[81] In a motion for summary judgment, the movant bears the initial burden of showing the absence of a genuine issue of material fact.[82] The burden then shifts to the non-movant to demonstrate the existence of a genuine issue of material fact.[83] "A fact is 'material' if its resolution could affect the outcome of the action,"[84] while a "genuine" dispute is present "only if a reasonable jury could return a verdict for the non-movant."[85] As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[86]

In conducting its analysis, the Court considers evidence from the entire record and views that evidence in the light most favorable to the non-movant.[87] Rather than combing through the record on its own, the Court looks to the motion for summary judgment and response to present

---

[81] Fed. R. Civ. P. 56(a).
[82] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[83] *See id.*
[84] *Burrell v. Dr. Pepper/Seven UP Bottling Grp.*, Inc., 482 F.3d 408, 411 (5th Cir. 2007) (internal quotation marks and citation omitted).
[85] *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citation omitted).
[86] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[87] *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) (citations omitted).

the evidence for consideration.[88] Parties may cite to any part of the record, or bring evidence in the motion and response.[89] By either method, parties need not proffer evidence in a form admissible at trial,[90] but must proffer evidence substantively admissible at trial.[91] However, a plaintiff may not rely simply upon the allegations in his complaint, but rather must bring forth summary judgment evidence of those facts alleged in the complaint.[92]

### III.   ANALYSIS

As a preliminary matter, the Court addresses the objections raised by Plaintiff in his response.[93] Each objection is to a statement made in *Defendant's motion* rather than directly to the evidence itself. The Court determines the evidentiary merits of a motion for summary judgment based on the evidence submitted, not based on statements made in a motion. Accordingly, the Court disregards Plaintiff's objections.

To establish a *prima facie* case of discrimination under Title VII, Plaintiff must prove that he is "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) that others similarly situated were treated more favorably."[94]

---

[88] *See* Fed. R. Civ. P. 56(e).

[89] *See* Fed. R. Civ. P. 56(c).

[90] *See Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

[91] *See Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[T]he evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").

[92] *Hugh Symons Grp. v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir. 2002) (citing *Celotex*, 477 U.S. at 324) ("Unsubstantiated assertions are not competent summary judgment evidence.").

[93] Dkt. No. 25 at 22, *et seq.*

[94] *Walker v. Harmony Pub. Sch.*, No. 22-20260, 2023 U.S. App. LEXIS 4658, at *4 (5th Cir. 2023) (*Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001)).

His retaliation claim, by contrast, requires that "(1) [he] participated in a protected activity; (2) [his] employer took an adverse employment action against [him]; and (3) a causal link exists between the protected activity and the adverse employment action."[95]

In both claims, Plaintiff "may prove a claim of intentional discrimination or retaliation either by direct or circumstantial evidence."[96] If Plaintiff makes his case on circumstantial evidence, the Court applies the *McDonnel Douglas* approach.[97] Under that approach, if the plaintiff can make this *prima facie* showing by circumstantial evidence, then the burden shifts to the defendant to present legitimate, non-discriminatory reasons for the adverse action.[98] If the defendant meets that burden, then the plaintiff has the burden to show that it is a mere pretext, or that the prohibited reason is still a motivating factor (termed the "mixed-motive alternative").[99]

### A. Adverse employment action for Plaintiff's **prima facie** *case of discrimination*

As to Plaintiff's discrimination claim, Defendant concedes that Plaintiff is part of a protected class (he is South Asian, Muslim, and Pakistani) and that he is qualified for the positions he has held at UTRGV.[100] Defendant disputes the third and fourth elements of Plaintiff's *prima facie* case.

Plaintiff based his discrimination claim on a great number of actions taken by Defendant,[101] but not all of them rise to the level of legally cognizable "adverse employment action." That phrase has been interpreted in the antidiscrimination context to mean "only ultimate employment

---

[95] *Id.* at *7 (citing *Taylor v. United ParcelServ., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008)).

[96] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

[97] *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020) (for discrimination); *Yancy v. US Airways, Inc.*, 469 F. App'x 339, 343 (5th Cir. 2012) (for retaliation).

[98] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[99] *Sanders*, 970 F.3d at 562 n.11; *Yancy*, 469 F. App'x at 343 (both citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

[100] Dkt. No. 22 at 15.

[101] Listed herein at the end of Part I.

decisions such as hiring, granting leave, discharging, promoting, or compensating."[102] "[A]n employment action that does not affect job duties, compensation, or benefits is not an adverse employment action."[103] But a "transfer or reassignment can be the equivalent of a demotion, and thus constitute an adverse employment action," if the transfer reduces prestige, leadership responsibilities, or pay.[104]

In keeping with the Fifth Circuit's precedent, the only adverse employment actions taken were (1) Plaintiff's removal as Chair of the Department of Electrical Engineering in April 2018, (2) Dr. Qubbaj's cancellation of Plaintiff's wife's assistantship in Psychology, and (3) his one-semester suspension without pay in Fall 2019. These actions "produce[d] an injury or harm"[105] because removal as Chair eliminated a stipend, prestige, and leadership responsibilities, the cancellation of his wife's stipend removed a tangible benefit to Plaintiff's household from his employment package,[106] and because the 2019 suspension was without pay.

The remainder of Plaintiff's allegations, even considered in the light most favorable to him, are not ultimate employment decisions. Defendant's actions with respect to travel requests, travel and publication reimbursements, Outside Activity requests, lab and office space, and course listings range from minor inconveniences and slights to denial of professional development opportunities. But none of them affected his job duties, compensation, or benefits.

Defendant's actions with respect to startup funds, the handling of Plaintiff's OIE complaint, Dr. Abraham's alleged threat to revoke Plaintiff's tenure, and Plaintiff's committee membership do not rise to the level of ultimate employment decisions either. Plaintiff ultimately

---

[102] *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007).

[103] *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (internal citation omitted).

[104] *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014).

[105] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006).

[106] This is the case whether or not the benefit was incorporated into his employment offer letter.

*was* allowed to roll over his Year I startup funds to Year II,[107] so there was no adverse action on this point. Defendant's enforcement of the category restrictions on these funds is not adverse employment action. Plaintiff's allegation in his complaint that his OIE complaint "was not properly included, and is still pending"[108] is not supported by the summary judgment evidence,[109] so it is disregarded. The alleged threat by Dr. Abraham (which Dr. Abraham denies[110])—even taken in the light most favorable to Plaintiff—does not constitute adverse employment action because "the Supreme Court is clear that the threat must produce some kind of injury or harm in order to be actionable under Title VII."[111]

The alleged exclusion of Plaintiff from committee membership does not rise to the level of adverse employment action. First, it is apparent from the record that Plaintiff was not "excluded by Abraham from all committee memberships"[112] since there are several documented incidents of him shouting in committee meetings. It appears that he *and Dr. Kumar* were excluded from evaluation committees due to their dispute over each other's evaluations.[113] Second, exclusion from a voluntary faculty committee is not adverse employment action unless it has a direct affect on compensation or eligibility for promotion.[114]

Therefore, only Plaintiff's removal as Chair, his wife's assistantship, and his suspension are adverse employment actions sufficient to meet the third element of his *prima facie* case.

---

[107] Dkt. No. 22-2 at 67.

[108] Dkt. No. 1 at 5, ¶ 9.d.

[109] Dkt. No. 22-2 at 64-84.

[110] Dkt. No. 25-3 at 11.

[111] *Perches v. Elcom, Inc.*, 500 F. Supp. 2d 684, 696 (W.D. Tex. 2007) (citing *Burlington*, 548 U.S. at 67).

[112] Dkt. No. 1 at 3, ¶ 7.d.

[113] Dkt. No. 22-2 at 71-72.

[114] *See Ekaidi v. Bd. of Supervisors*, No. 16-7523, 2017 U.S. Dist. LEXIS 24484, at *15 (E.D. La. 2017); *accord Whittington v. Trs. of Purdue Univ.*, No. 2:09 cv 9, 2012 U.S. Dist. LEXIS 27835, at *25 (N.D. Ind. 2012).

### B. *Adverse employment action for Plaintiff's* **prima facie** *case of retaliation*

The Supreme Court of the United States has adopted a somewhat broader scope for adverse action in the antiretaliation context, taking into account "materially adverse" acts "beyond workplace-related or employment-related" ones, so long as they still "produce[] an injury or harm."[115]

Despite that broadening of possible adverse actions, Plaintiff's retaliation claim is narrowed substantially by the fact that the protected activity—the filing of an OIE complaint against Dr. Abraham—did not take place until March 4, 2019.[116] After that date, Plaintiff alleges that he was threatened with revocation of tenure, suspended, directed to teach course outside his area of expertise, delayed or denied reimbursements for travel, and that his OIE complaint was not handled properly.[117] The Court has already disposed of each of these claims (except the suspension) as moot or not injurious. Even under *Burlington*, these are "trivial harms"[118] that a reasonable employee would see as going with the territory of university administrative bureaucracy. Only Plaintiff's one-semester suspension without pay constitutes adverse employment action.

### C. *Circumstantial evidence of causation*

Now that the Court has narrowed its analysis to three adverse employment actions (removal as Chair, cancellation of Plaintiff's wife's assistantship, and suspension), it can examine the causation elements of Plaintiff's *prima facie* cases for discrimination and retaliation. But an important threshold question is whether Plaintiff makes the case for causation through direct or

---

[115] *Burlington*, 548 U.S. at 66-68.
[116] Dkt. No. 22-2 at 64. This is protected, so the first element of a *prima facie* retaliation claim is met.
[117] Dkt. No. 1 at 4-5, ¶ 9.
[118] *Burlington*, 548 U.S. at 68.

circumstantial evidence. If the evidence is strictly circumstantial, then the Court can fast track to *McDonnel Douglas* burden shifting.

Plaintiff's discrimination claim is based on his being a South Asian, Muslim faculty member from Pakistan. He indicates that no one ever called him any names, made any jokes or comments, or otherwise negatively discussed his race, religion, or national origin.[119] The only indication of any religious undercurrent is that Plaintiff alleges that his absence from Friday faculty meetings impacted Dr. Abraham's decision to deny his travel and Outside Activity requests.[120] But Plaintiff was never reprimanded for missing Friday meetings,[121] nor does the summary judgment evidence present any indication that Dr. Abraham's view of Plaintiff as generally absent from campus was influenced by Plaintiff's presence or absence from faculty meetings. Dr. Abraham's frustration with Plaintiff's absence was about his being unavailable to students and to pick up equipment deliveries.[122]

As a further attempt at direct evidence, Plaintiff submits that Dr. Abraham circulated a list of candidates for a faculty position to the hiring committee, and that candidates with Muslim surnames did not become finalists.[123] This too is circumstantial evidence since there is no evidence that Dr. Abraham discounted candidates with Muslim surnames, nor that he intentionally circulated the list of names in order to apprise the hiring committee of candidates' religious affiliation or country of origin.[124]

---

[119] Dkt. No. 22-2 at 5-6.

[120] *Id.*

[121] *Id.*

[122] Dkt. No. 25-3 at 9, 31; Dkt. No. 22-2 at 77.

[123] Dkt. No. 25 at 16, ¶ 13; Dkt. No. 22-2 at 82-83.

[124] It is worth noting that the only evidence (albeit uncorroborated) of direct religious discrimination in this case was *by* Plaintiff when he is alleged to have told Dr. Kumar (a Hindu faculty member), "I come from a ruling caste in my country and I am going to show you, I am going to screw you, and show you, show you what I can do to you, you watch." Dkt. No. 22-2 at 97.

Plaintiff's retaliation claim is based on his March 4, 2019, OIE complaint. While Plaintiff can point out that his suspension was two months after the complaint was filed, he cannot show that Dr. Qubbaj, who issued the suspension, knew about the complaint or was influenced by it.[125] He can only show proximity—that the suspension came two months after his complaint—which is circumstantial.

Thus, assuming *arguendo* that Plaintiff can prove causation by circumstantial evidence and make out a *prima facie* case, *McDonnel Douglas* shifts the burden to Defendant to present a legitimate, non-discriminatory and non-retaliatory reason for the removal of Plaintiff as Chair, cancellation of his wife's assistantship, and his suspension.

### D. Defendant's legitimate, nondiscriminatory reason

Defendant generally cites Plaintiff's unprofessional, uncollegial, and insubordinate behavior as its reason for acting against him. When Dr. Qubbaj removed Plaintiff as Chair of the Department in 2018, Dr. Qubbaj initially stated simply that he was "trying to form a team that is going to help [him] achieve [his] vision."[126] Defendant's pleading pin that decision on Plaintiff's "inappropriate conduct."[127] On a review of the facts, Plaintiff's aggressive and condescending conduct toward Dr. Kumar, which culminated in a substantiated claim of retaliation against Plaintiff in February of 2018,[128] was a sufficient reason for Dr. Qubbaj to not want Plaintiff on his leadership "team." Plaintiff's retaliation against Dr. Kumar showed Plaintiff's inability to lead the Department, and it was both legitimate and nondiscriminatory for Dr. Qubbaj to make a staffing decision on that basis.[129]

---

[125] Dkt. No. 25-6 at 16-18.
[126] Dkt. No. 25-6 at 6.
[127] Dkt. No. 22 at 18.
[128] Dkt. No. 22-2 at 107.
[129] *See Ramroop v. Cooper Cameron Corp.*, 202 F. App'x 1, 2 (5th Cir. 2006) ("aggressive and disruptive behavior" is a legitimate, nondiscriminatory reason); *see also Dittmar v. 3M Co.*, No. 6:21-CV-043-H, 2022 U.S. Dist. LEXIS

Dr. Qubbaj's reason for cancelling Plaintiff's wife's assistantship in the Department of Psychology appears—from the summary judgment evidence—to have little to do with anyone's performance. Ms. Espinosa from OIE found that "Dr. Qubbaj, acting within his authority, made the decision because he believed it was his fiscal responsibility to manage monies for the college as intended and because he did not think it was appropriate to use his college assistantship funds for a student in another college" and that the allocation, though represented to Plaintiff at his hire, was not supported by the College's policies nor incorporated in Plaintiff's offer letter.[130] Dr. Qubbaj disagreed with his predecessor's lax attitude about the assistantship funds, and he wanted College of Engineering and Computer Science funds to go to its own students. The OIE Report further indicates that the cancellation was not as much of a rug pull as it might seem on first pass since Plaintiff's wife's assignment in Psychology was set to end in August of 2018 anyway, even though the startup funds ran longer than that date.[131] Whether the Court agrees with Dr. Qubbaj's management decision is not the question. Legally, restricting College assistantship funds to the College's own students is both legitimate and nondiscriminatory.

Defendant cites Plaintiff's unprofessional, uncollegial, and insubordinate conduct as its reason for suspending him in May of 2019. It provided four specific incidents to justify its disciplinary action: Plaintiff raising his voice in the hallway on September 14, 2018; Plaintiff raising his voice in the faculty meeting on February 28, 2019; Plaintiff's email response to Dr. Abraham regarding online teaching; and Plaintiff's failure to submit his official undergraduate transcript.[132] For opposing evidence, Plaintiff submits his own (unsworn) declaration stating that

---

230305, at *20 (N.D. Tex. 2022) ("leadership behaviors [such] as unprofessional, condescending, and demeaning" behavior is a legitimate, nondiscriminatory reason).

[130] Dkt. No. 22-2 at 76-77; *see also* Dkt. No. 25-6 at 14.

[131] *Id.* at 77.

[132] *Id.* at 11.

he had to use a loud voice so people could hear him and characterizing his emails about online teachings as "requests."[133] But "a self-serving affidavit, without more evidence, will not defeat summary judgment."[134] On review of the summary judgment evidence, the Court finds no genuine dispute as to any material fact that Plaintiff was unprofessional and insubordinate, which is a legitimate and nondiscriminatory reason for his suspension.[135]

### E. Pretext or mixed motive

The burden then shifts back to Plaintiff to show that Defendant's reasons are mere pretexts. Plaintiff contends that Defendant's reason to remove him as Chair must be pretextual because no reason was given at the time of the demotion.[136] But "a lack of contemporaneous documentation, alone, is not evidence of pretext; the employee must also demonstrate why the absence of documentation matters."[137] Plaintiff does not carry that burden. The lack of explanation is attributable to the fact that the Dean does not need a reason in order to remove a department Chair.[138]

Plaintiff cannot produce any evidence that his race, religious, or national origin played a role in any of the three adverse employment actions. His own conjectures about his absence from Friday afternoon meetings or about the hiring committee's decision not to hire a Muslim candidate in a single round of hiring do not inject a genuine question of material fact as to discrimination into Defendant's motivation. A reasonable jury could not find that the four incidents of

---

[133] Dkt. No. 25-2 at 1, 3.
[134] *Di Ann Sanchez v. Dall./Fort Worth Int'l Airport Bd.*, 438 F. App'x 343, 346-47 (5th Cir. 2011); *but see Spring St. Partners - IV, L.P. v. Lam*, 730 F.3d 427, 441 n.7 (5th Cir. 2013) (explaining that a "self-serving" affidavit is permissible if it is supported by evidence in the record).
[135] *Collier v. Dall. Cty. Hosp. Dist.*, 827 F. App'x 373, 376 (5th Cir. 2020).
[136] Dkt. No. 25 at 4.
[137] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015).
[138] Dkt. No. 25-6 at 6.

unprofessional and insubordinate behavior (especially combined with a much longer history of the same behavior) were mere pretexts for discrimination.

Plaintiff argues that his suspension must have been retaliatory because he did not have any additional infractions between the time he filed his OIE complaint in March 2019 and Dr. Qubbaj's notice of intent to suspend in May 2019.[139] But that is not true. His insubordinate email about online teaching ("Oh no. It will be. Trust me on this.") was sent April 10, 2019.[140] Furthermore, there were new emails among administrators about his continued refusal to supply his undergraduate transcript on May 6, 2019.[141]

For these reasons, even if Plaintiff can make out a *prima facie* case on the three adverse employment actions taken against him, Defendant can produce a legitimate, nondiscriminatory, non-retaliatory, and non-pretextual reason for each action. Thus, Defendant's motion for summary judgment is **GRANTED**.

## IV.      ATTORNEY DISCIPLINE

It is unfortunate and ironic that in a case where Plaintiff was ultimately suspended for his aggressive, intimidating, and unprofessional conduct, his attorney would participate in the same sort of behavior in litigation. The Texas Rules of Disciplinary and Professional Conduct state that "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."[142]

---

[139] Dkt. No. 25 at 18, ¶ 18.
[140] Dkt. No. 22-2 at 18.
[141] *Id.* at 22.
[142] TEX. R. DISC. PROF'L. COND. 4.04(a).

Blatantly and on the record, Mr. Robert E. Goodman, Jr. makes harassing and inappropriate comments to deposition witnesses. For example, in his deposition of Dr. McHatton, he asks, "are you married?" and "is your husband your husband at your pleasure?"[143] This is not for biographical context or to make a relevant point, but instead to give her a bad example of an easily understood concept: at-will employment.

With respect to another issue, the Court recognizes that in a discrimination case, race will often be a necessary and sensitive topic in testimony. But that does not excuse Mr. Goodman's offensive behavior. The Court excerpts a portion:[144]

> Q.   (BY MR. GOODMAN) Dr. Iqbal is not Caucasian, is he?
> **A.   (BY DR. MCHATTON) I don't know how Dr. Iqbal self-identifies.**
> Q.   I don't care about his self-identification. By image, by looking at him, he is not Caucasian like you are, correct?
> **A.    I don't consider myself Caucasian. I am a Latina woman, so I consider myself a person of color, so that --**
> Q.    You -- you consider yourself mestizo, then?
> **A.   I consider myself a woman of color as like --**
> Q.   Okay. Because you're mestizo? Because you say you have Hispanic and Indian blood?
> **A.   Not Indian blood.**
> Q.   Okay.

Mr. Goodman's insistence on cornering the witness into an 18th century racial category by telling, instead of asking, is inappropriate and unbecoming for a member of the legal profession.

In his deposition of Dr. Qubbaj, Mr. Goodman weaponizes questions about the English language to embarrass and antagonize the witness. The Court quotes again:

> **A.   (BY DR. QUBBAJ) Could you repeat the question?  I didn't understand it clearly.**
> Q.   (BY MR. GOODMAN) Yeah, by policy number, what was the policy at the university which allowed for suspension?  What was the policy number?

---

[143] Dkt. No. 25-5 at 5.
[144] *Id.* at 6.

**A.   I don't recall the number.  I don't -- you know, but --**

Q.   Okay.  You did not draft this letter, did you?

**A.   I -- I did most of it in consultation with -- with our counsel.**

Q.   Right.  But you had -- you had a lawyer to help you with this, right?

**A.     I always consult with our counsel before taking any -- any action, especially when -- you know, any personnel actions.**

Q.   English is not your first language, is it?

MS. BENNETT:  Objection, badgering the witness.

Q.   (BY MR. GOODMAN)  English is not your first language, is it, Dr. Qubbaj?

MS. BENNETT:  Objection, irrelevant, badgering the witness.

Q.   (BY MR. GOODMAN)  You can answer.

**A.   English is not my first language.**

Q.   Your first language is Arabic?

**A.   Yes, sir.**

Q.   Okay.  And you don't remember what policy provided for suspension.  Is that your testimony?[145]

In context, Mr. Goodman's question was not intended to elucidate useful or relevant information from the witness. It was meant to harass.

In his deposition of Dr. Abraham, Mr. Goodman asked him a number of prying questions about Dr. Abraham's own religious observance, and then seemingly attempted to have the witness agree that Fridays for Muslims are the *exact* analogue of the Jewish Sabbath.[146] When Dr. Abraham responded, "I did not know that they celebrate on Fridays," Mr. Goodman quipped, "Okay. I guess you were born yesterday, right?"[147]

These instances—to name just a few—have no substantial purpose other than to embarrass, intimidate, and discomfort. The Court therefore **WARNS** Mr. Goodman that such conduct will not be tolerated by this Court. Should it reoccur, the Court will pursue sanctions under Rule 11.

---

[145] Dkt. No. 25-6 at 18.

[146] Dkt. No. 25-3 at 10 (Q.   "[W]hen Dr. Iqbal told you he had religious -- he had a religious obligation on Friday which would preclude his attendance at Friday faculty meetings, you understood that as being his saying, 'I am going to try to honor my Sabbath,' right?")

[147] *Id.*

## V.        HOLDING

For the foregoing reasons, the Court finds that there is no genuine dispute as to any material fact in this case and **GRANTS** Defendant's motion for summary judgment. A separate final judgment will issue, pursuant to Rule 54.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 8th day of March 2023.

_____

Micaela Alvarez

United States District Judge
